TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00019-CV






Sterling Wayne Wyatt, Appellant


v.


Capital One Auto Financing, Appellee






FROM COUNTY COURT AT LAW NO. 4 OF WILLIAMSON COUNTY

NO. 05-1004-CC1-4, HONORABLE JOHN MCMASTER, JUDGE PRESIDING



 

M E M O R A N D U M O P I N I O N


 Sterling Wayne Wyatt appeals from a grant of summary judgment and award of
attorney's fees to appellee, Capital One Auto Financing ("COAF"). Wyatt purchased a car from
Waco Auto Imports ("WAI"), which then assigned Wyatt's purchase contract to COAF. Wyatt
refused to recognize the validity of the assignment and consequently refused to tender his monthly
car payments to COAF. COAF eventually reacquired Wyatt's car, sold it for less than Wyatt owed
on it, and filed this lawsuit to recoup the shortfall. Wyatt counterclaimed for damages he claims to
have incurred as a result of COAF's allegedly wrongful reacquisition and sale of his car. On appeal,
Wyatt argues that COAF's summary-judgment evidence did not conclusively establish either that
COAF was entitled to recover its shortfall from the sale of Wyatt's car or that Wyatt's counterclaims
were meritless. We will affirm the summary judgment. 



FACTUAL AND PROCEDURAL BACKGROUND

 On October 13, 2001, Wyatt purchased a Kia Sedona minivan from WAI. Wyatt
executed a standard-form contract (the "Texas Simple Interest Vehicle Retail Installment Contract")
that was stamped, presumably by WAI, with the identification number "51298." The contract
contained the following provisions (among others):



 "Any change in this contract must be in writing and signed by you [the purchaser] and
the Creditor."

 "You [the purchaser] give the Creditor a security interest in . . . [t]he vehicle."

 "You [the purchaser] agree to have the certificate of title show [the Creditor's] security
interest (lien) in the vehicle." 

 "If no other Assignee is named in a separate assignment attached to this contract, the Seller
assigns it to Mazda American Credit."




Wyatt alleges that no separate assignment was attached to the contract when he signed it and that
consequently he took possession of the car thinking that WAI would assign the contract to Mazda
American Credit. In fact, WAI assigned the contract to COAF.

 It is not clear exactly when, but at some point WAI executed a pre-printed "Contract
Assignment" form on COAF letterhead that stated: "Seller hereby expressly sells, assigns and
transfers all right, title and interest to Capital One Auto Finance." The form was signed by WAI
employee Mary Ann Casey. Her signature was dated October 13, 2001, the same day Wyatt
executed his purchase contract with WAI. The form also contained the following sentence: "This
assignment is attached to and expressly made a part of Contract Number ___________." The blank
following "Contract Number" was not filled in, but the information contained in other blanks on the
form was sufficient to identify "Mary Ann Casey of Waco Auto Imports" as "Seller,"
"Sterling W. Wyatt" as "Buyer," and "10-13-01" as the execution date of the contract being assigned. 
 It is also not clear exactly when Wyatt first received a copy of this Contract
Assignment form or other notification that his contract had been assigned to COAF. The record
indicates, however, that at the latest, COAF informed Wyatt of the assignment by letter dated
October 25, 2001. (1) The record also indicates the following:



 The title to Wyatt's new car, issued on November 3, 2001, named COAF as sole lienholder
and October 13, 2001 as the date that COAF's lien attached;

 Wyatt received a payment coupon book from COAF on or around November 15, 2001;

 COAF began sending monthly account-balance statements to Wyatt in November 2001;

 COAF sent a letter to Wyatt on November 27, 2001 that stated: "CapitalOne [sic] Auto
Finance received a letter from you [presumably referring to Wyatt's November 8, 2001 letter]
regarding validation of [your] account. Enclosed you will find copies of all documents
pertaining to your account with CapitalOne [sic] Auto Finance." The letter indicates that
twelve pages of enclosures were included, but only one of those pages is in the record--a
copy of the above-described Contract Assignment form executed by WAI.



 Despite these facts, Wyatt insisted on further proof that COAF had been assigned his
contract. On December 12, 2001, he sent COAF a "request for clarification" letter that apparently
elicited no response. (2) On January 14, 2002, he sent COAF another letter that stated:


 Upon receipt of your allegation of debt [presumably the October 25, 2001
letter discussed above], I requested validation via a Disclosure Statement be made
pursuant to the Fair Debt Collection Practices Act. Your provided package of data
[presumably referring to the enclosures accompanying COAF's November 27, 2001
letter] did not contain a contract with Capital One signed by me, nor did it contain
my signed contract with another party allowing an un-agreed change or assignment
of any debt to Capital One or any other party. My request for clarification has gone
unanswered in excess of 30 days and you are in a condition of FAULT.

 This is your final opportunity to clear your FAULT by providing me, withing
[sic] five (5) days from your receipt of this notice under the Administrative
Procedures Act, a contractual or legal basis for your allegation of being a bonafide
collector of a debt from me.

 Your failure to timely satisfy my requests within the requirements of the Fair
Debt Collection Practices Act and Administrative Procedures Act places you in
DEFAULT of any alleged claim against me, and is construed as (a) your absolute
waiver of any and all claims against me, and (b) that your collection efforts are being
terminated, and (c) as your tacit agreement to compensate me for defense costs and
attorney fees hereafter.

 Absent clearance of your condition of FAULT, then pursuant to the Fair Debt
Collection Practice Act, I request that you cease further communications with me
except to complete and return the attached COLLECTOR'S NOTICE as required by
law.



 Wyatt apparently received no response to this letter either, and on February 11, 2002,
he sent another letter to COAF. Titled "NOTICE OF DEFAULT AND DEFAULT," that letter
stated:

 This is NOTICE that CAPITAL ONE AUTO FINANCING is in DEFAULT
of timely satisfying my requests within the requirements of the Fair Debt Collection
Practices Act and Administrative Procedures Act. Your specific DEFAULT is for
failing to provide evidence of a contractual or legal basis for allegations by
CAPITAL ONE AUTO FINANCING of their being a bonafide collector of a debt
from the undersigned . . .

 The TEXAS SIMPLE INTEREST VEHICLE RETAIL INSTALLMENT
CONTRACT which you provided clearly addresses STERLING W WYATT as the
BUYER, and designates "WACO AUTO IMPORTS" as the CREDITOR and carries
a final statement cautioning that "Any changes in this contract must be in writing
and signed by you [the buyer] and the Creditor." You have failed to provide any
addendum to the contract signed by me and naming CAPITAL ONE AUTO
FINANCING as an agreed assignee. The contract assignment you provided is signed
only by WACO AUTO IMPORTS and alleges to be a part of the above contract but
does not carry my signature as required by the basic contract provisions, and thus
is not binding upon me as a matter of contract law and the Texas Business and
Commerce Code. WACO AUTO IMPORTS is without contract or legal authority
to sell my debt to CAPITAL ONE AUTO FINANCING, and therefor [sic] CAPITAL
ONE AUTO FINANCING is absent standing to enforce their alleged debt upon me.


 . . . .


 Your DEFAULT . . . is construed

(a) as your absolute waiver of any and all claims against me, including withdrawal
of any lien arising out of my contract with WACO AUTO IMPORTS erroneously
filed in the name of CAPITAL ONE AUTO FINANCING on any of my property,

(b) that your collection efforts are being terminated, and that any CAPITAL ONE
AUTO FINANCING Statements of Account subsequently received are sent in error
and may be ignored, and

(c) as your tacit agreement to compensate me hereafter for necessary defense costs
and attorney fees, plus one million dollars punitive damages for proceeding without
first providing substantive proof on the administrative record.


 Wyatt recorded this letter in the public records of McLennan County. In the
meantime, he had tendered his first three monthly car payments to WAI. WAI apparently kept the
first two payments (it is not clear what it ultimately did with them), but it returned the third. In the
letter to Wyatt accompanying the returned third payment, sent on or about February 1, 2002,
WAI stated:


As you know we are not your creditor--you got your financing through Capital One
Auto Finance. Your loan and contract is with them and not with us. We are sending
your check back to you again BECAUSE we are not your lender. We aren't trying
to collect any money from you and we are asking you to stop sending us your
payments. Your contract is with Capital One Auto Finance and your payment should
be made to them.



 Wyatt nevertheless insisted on sending his fourth monthly car payment to WAI as
well. In a letter transmitting that payment, dated March 7, 2002, Wyatt stated:


 I am in receipt of your letter sent o/a 2/1/2002 indicating your disposition of
Contract #51298 to Capital One Auto Finance and returning my second (payment #3)
check. Never-the-less [sic], I am enclosing payment #4 against that Contract made
out to you since Capital One has failed to provide me with proof they are the lawful
Holder in due course. If you have some documentation that shows Capital One is the
lawful Holder, would you please provide me with a copy? Alternatively, please
indicate to whom, and by which instrument, you surrendered being Holder of the
contract . . . .

 In the absence of you providing me with an instrument containing my
signature amending the above referenced contract or assigning the contract to a third
party, I will assume such does not exist in your administrative records.


 

 WAI returned Wyatt's fourth payment as well. In the accompanying letter, dated
March 25, 2002, WAI wrote:


 We have received your letter dated 3/7/02. This letter is meant to help you
understand that Waco Auto Imports is not and will not be servicing your retail auto
loan on your 2002 Kia Sedona . . . .

 This retail loan has been sold to and assigned to Capital One Auto Finance. 
A copy of the assignment is enclosed for your information.

 Please understand that your auto financing is in order and your payments are
payable to Capital One Auto Finance. Your monthly payments are $478.79 and due
on the 12th of each month. Your payments should be made to Capital One Auto
Finance, 3901 Dallas Pkwy, Plano, Tx 75093. I am returning your check for
$478.79. Please forward this to Capital One at the above address.



 The "copy of the assignment" that WAI enclosed with its March 25, 2002 letter
differed from the Contract Assignment form that COAF had previously sent Wyatt. Both
assignments were filled out on the same "Contract Assignment" form bearing COAF letterhead, so
both contained the pre-printed sentence "This assignment is attached to and expressly made a part
of Contract Number ___________." Unlike the form COAF had sent Wyatt, however, the form
WAI sent Wyatt had the blank in this sentence filled in with "#669322." (3) In addition, the form WAI
sent Wyatt (1) was signed by someone other than Mary Ann Casey, and (2) identified "Waco Kia
of Waco, TX" rather than "Mary Ann Casey of Waco Auto Imports" as "Seller." In other words,
COAF and WAI sent Wyatt differently filled-out Contract Assignment forms. Both forms, however,
purported to have been signed on October 13, 2001 and to effect the assignment of Wyatt's contract
to COAF.

 Wyatt did not forward his March 2002 car payment to COAF as WAI instructed him
to, nor did he tender any subsequent payments to anyone. (4) On June 20, 2002, COAF sued Wyatt in
McLennan County to regain possession of the Kia. The court issued a writ of sequestration that, for
reasons not revealed in the record, was returned unserved. COAF then filed a motion for contempt
against Wyatt, apparently for refusing to comply with the writ of sequestration even though it was
never served on him. Wyatt filed an Answer, a motion to quash the writ of sequestration, a motion
to deny COAF's motion for contempt, a counterclaim, and a demand for a jury trial. (5) The McLennan
County district court held a hearing on September 13, 2002. Its docket entry for the hearing states: 
"COURT FOUND SUFFICIENT EVIDENCE OF CONTEMPT BUT WITHHELD FINDING
BECAUSE DEFENDANT SURRENDERED KEY TO VEHICLE IN QUESTION." (6) Wyatt claims
that he surrendered the key only because the court threatened to incarcerate him immediately if he
did not. 

 On September 16, 2002, COAF notified Wyatt that it intended to sell his Kia unless
Wyatt paid it the balance due on his contract ($25,137.22) within ten days. Wyatt did not do so, and
on October 28, 2002, COAF notified Wyatt that it had sold the Kia for $14,200 and that Wyatt still
owed it $11,167.22--the difference between the sale price and the amount COAF was due under
the contract. (7)

 Neither party pursued further substantive activity in the McLennan County case, and
the court finally dismissed it for want of prosecution on October 6, 2004. (8)

 On August 22, 2005, COAF filed this lawsuit against Wyatt to collect the money it
lost on the sale of Wyatt's Kia. (9) COAF alleged in its new suit that Wyatt owed it $18,633.33,
representing its $11,167.22 loss on the sale of Wyatt's car plus interest. On September 26, 2005,
Wyatt filed a Verified Original Answer and Counter-Claim in which he (1) argued that COAF had
no right to recover that amount, and (2) counterclaimed for damages caused by COAF's allegedly
wrongful taking and sale of his car. 

 On September 6, 2006, Wyatt moved for summary judgment. COAF moved to refer
the case for alternative dispute resolution, but Wyatt refused to participate. The court denied Wyatt's
motion for summary judgment on March 26, 2007, and COAF subsequently filed its own motion for
summary judgment. COAF's summary-judgment evidence included the following:



 an affidavit by COAF's custodian of records, Stephen Ortiz, attesting that COAF owned and
held Wyatt's purchase contract and was owed $18,633.33 on it;




 a copy of Wyatt's purchase contract; (10)
 a copy of the Contract Assignment form signed by Mary Ann Casey; and
 a copy of the title to Wyatt's car, listing COAF as sole lienholder.



 The court granted COAF's summary-judgment motion and awarded COAF its costs
and attorney's fees. Wyatt then perfected this appeal.


STANDARD OF REVIEW

 Summary judgment is proper when the movant establishes that there are no genuine
issues of material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c);
Lear Siegler, Inc. v. Perez, 819 S.W.2d 470, 471 (Tex. 1991). In reviewing a grant of summary
judgment, we take as true evidence favorable to the nonmovant, indulging every reasonable inference
and resolving all doubts in the nonmovant's favor. Centeq Realty, Inc. v. Siegler, 899 S.W.2d 195,
197 (Tex. 1995). 


DISCUSSION

 Wyatt contends that summary judgment was improper because fact questions exist
as to (1) whether COAF was actually assigned Wyatt's contract; (2) whether Wyatt was entitled to
relief on his counterclaims; and (3) whether Wyatt breached his purchase contract, thus entitling
COAF to seize and sell his car and sue him for its loss on the sale. 

 Wyatt cites three facts to support his argument that COAF was never validly assigned
his contract: (1) his purchase contract stated that "[a]ny change in this contract must be in writing
and signed by you [the purchaser] and the Creditor"; (2) his purchase contract stated that "[i]f no
other Assignee is named in a separate assignment attached to this contract, the Seller assigns it to
Mazda American Credit"; and (3) COAF failed to verify its assignment to Wyatt's satisfaction.

 Wyatt misconstrues the elements of a valid contract assignment. Texas Business and
Commerce Code section 9.406 states: "[A] term in an agreement between an account debtor and an
assignor . . . is ineffective to the extent that it . . . requires the consent of the account debtor . . . to
[an] assignment." Tex. Bus. & Com. Code Ann. § 9.406(d)(1) (West 2002 & Supp. 2009). In other
words, Wyatt's purchase contract could not legally require Wyatt's consent to an assignment. (11) 

 Texas Business and Commerce Code section 9.406 also states:


[A]n account debtor . . . may discharge its obligation by paying the assignor until, but
not after, the account debtor receives a notification, authenticated by the assignor or
the assignee, that the amount due or to become due has been assigned and that
payment is to be made to the assignee. After receipt of the notification, the account
debtor may discharge its obligation by paying the assignee and may not discharge the
obligation by paying the assignor.



Id. § 9.406(a). A related subsection of the statute states that "if requested by the account debtor, an
assignee shall seasonably furnish reasonable proof that the assignment has been made. Unless the
assignee complies, the account debtor may discharge its obligation by paying the assignor, even if
the account debtor has received a notification under Subsection (a)." Id. § 9.406(c). In other words,
once Wyatt received "notification" that WAI assigned his contract to COAF--and once COAF
provided "reasonable proof" of the assignment--Wyatt could discharge his debt only by paying
COAF directly.

 The question in the present case, then, is whether the record contains conclusive
evidence that COAF provided Wyatt "reasonable proof" of the assignment. COAF attempted
to enclose proof of its assignment with its November 27, 2001 letter to Wyatt. Only one of the
twelve pages it enclosed is in the record--namely, the Contract Assignment form signed by WAI
employee Mary Ann Casey. Wyatt argues that the form was not "reasonable proof" of the
assignment because it was not completely filled out (12) and because it differed from the Contract
Assignment form he later received from WAI. We disagree. First, the form was printed on COAF
letterhead. See id. § 9.406, cmt. 2. (assignment "normally could be ['authenticated'] by sending
notification on the notifying person's letterhead"). Second, even though the form contained a blank,
it still clearly identified Wyatt's purchase contract as the contract being assigned; it named "Mary
Ann Casey of Waco Auto Imports" as "Seller," "Sterling W. Wyatt" as "Buyer," and "10-13-01" as
the execution date of the contract being assigned. Third, even though the form COAF sent Wyatt
was filled out in a slightly different manner from the form WAI sent Wyatt, both forms
clearly concerned Wyatt's October 13, 2001 purchase contract with WAI. Thus, we hold that the
summary-judgment evidence conclusively demonstrates that COAF supplied Wyatt with "reasonable
proof" of its assignment even though the record does not contain the other paperwork COAF
transmitted to Wyatt with its November 27, 2001 letter. (13) See id. § 9.406(b)(1) (notification of
assignment is effective if it "reasonably identif[ies] the rights assigned").

 This conclusion is buttressed by the fact that Wyatt had many other forms of proof
that COAF was assigned his contract. First, the title to Wyatt's car listed COAF as sole lienholder. (14) 
Second, COAF sent Wyatt a payment coupon book and started sending him monthly account balance
statements in November 2001. Third, as discussed above, WAI repeatedly returned checks to Wyatt
and explained to him that it had assigned his contract to COAF. In light of these facts, Wyatt could
not reasonably continue to doubt that COAF had been assigned his contract. In any event, Wyatt was
not entitled to withhold payments altogether; rather, he was obligated to keep paying WAI until
reasonable proof of assignment was furnished. See id. § 9.406, cmt. 4 (stating that § 9.406(c), which
allows account debtor to seek reasonable proof of assignment, "does not excuse the account debtor
from timely compliance with its obligations" while awaiting proof). Thus, Wyatt breached his
purchase contract by discontinuing payments. As the assignee-in-fact of Wyatt's contract, COAF
was entitled to seize Wyatt's car, sell it, and sue Wyatt for its loss on the sale regardless of whether
Wyatt questioned the validity of its assignment. See Burns v. Bishop, 48 S.W.3d 459, 466
(Tex. App.--Houston [14th Dist.] 2001, no pet.) (assignee entitled to enforce all rights that
assignor possessed).

 Wyatt cites the federal Fair Debt Collection Practices Act, 15 U.S.C.A. §§ 1692 et
seq. (West 2009), to support his assertion that he was entitled to withhold payments because COAF
did not verify its assignment via certain statutorily mandated procedures. The Fair Debt Collection
Practices Act does not apply here, however, because COAF does not qualify as a "debt collector"
under the Act. See Neff v. Capital Acquisitions & Mgmt. Co., 352 F.3d 1118, 1121 (7th Cir. 2003)
(Fair Debt Collection Practices Act applies only to "debt collectors" as defined by Act); 15 U.S.C.A.
§ 1692a(6) (defining "debt collector" for purposes of Act). 

 In sum, the record conclusively establishes that COAF was assigned Wyatt's purchase
contract and that Wyatt had ample verification of that fact. COAF was entitled to receive payment
on the contract and to seize and sell Wyatt's car when Wyatt failed to make those payments. It
necessarily follows that Wyatt did not sustain legally cognizable damage from COAF's actions. 
See Martin v. Trevino, 578 S.W.2d 763, 769 (Tex. Civ. App.--Corpus Christi 1978, writ ref'd n.r.e.) 
(use of process for proper purpose not actionable). Thus, Wyatt's counterclaims failed as a matter
of law, and COAF was entitled to summary judgment on them. 

 Finally, COAF submitted affidavits establishing that Wyatt owed it $18,633.33 for
its losses on the sale of Wyatt's car. Wyatt did not controvert that amount, so COAF was entitled
to recover it on summary judgment. See Tex. R. Civ. P. 185. COAF was also entitled to recover its
attorney's fees because it sued on a written contract. See Tex. Civ. Prac. & Rem. Code Ann.
§ 38.001(8) (West 2008). 


CONCLUSION

 The record conclusively establishes that COAF was assigned Wyatt's purchase
contract. Thus, COAF was entitled to be paid by Wyatt and to seize and sell Wyatt's car when Wyatt
refused to pay. It was also entitled to recover its loss on the sale of Wyatt's car. As a result of these
facts, which COAF established through competent summary-judgment evidence, Wyatt's
counterclaims failed as a matter of law. We affirm the trial court's summary judgment.



 __________________________________________

 J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed: January 29, 2010
1. That letter is not in the record, but Wyatt's reply letter is. Titled "Re inquiry dated
10/25/01," and dated November 8, 2001, Wyatt's letter states: 


I am confused by your inquiry. This is my notice that your claim is disputed . . . . I
request validation be made pursuant to the Fair Debt Collection Practices Act. Please
complete and return the attached disclosure request form . . . . I am requesting a
'validation,' containing competent evidence that I have some contractual obligation
to make payments to you. 


In another letter to COAF, dated January 14, 2002, Wyatt refers to "Your allegation of Debt,
10-25-2001." These letters indicate that COAF's letter of October 25, 2001 informed Wyatt that
COAF held his debt.
2. Wyatt's "request for clarification" letter is not in the record, but Wyatt refers to it in his
January 14, 2002 letter to COAF, which is in the record.
3. COAF's November 27, 2001 letter to Wyatt indicates that "6693220" was the "account
number" COAF assigned to Wyatt's contract. Recall, in contrast, that WAI had assigned an
identification number of "51298" to Wyatt's contract before it assigned it to COAF.
4. In his Verified Original Answer and Counter-Claim filed in this suit, Wyatt stated that
WAI's and COAF's failures to validate the assignment to his satisfaction "were valid reasons to
make no further payments to anyone until the matter was satisfactorily explained or otherwise
decided in a judicial forum." 
5. These documents are not in the record, but their existence is reflected in the McLennan
County court's docket sheet (which is in the record). 
6. This finding is troublesome given that (1) the writ of sequestration apparently was never
actually served on Wyatt, and (2) the record suggests no grounds for contempt other than refusal to
obey the writ. It is also troublesome that, despite the docket entry stating that the contempt finding
was withheld, the court in fact partially granted COAF's motion for contempt. In an order dated
September 13, 2002, the court held Wyatt in contempt "for refusing to surrender the motor vehicle
to the Constable as ordered." The order also stated, however, that "Defendant shall not be fined nor
jailed because he has now surrendered the vehicle to Plaintiff." Declining to fine or jail Wyatt after
holding him in contempt is not the same thing as "withholding" a contempt finding.
7. Wyatt claims on appeal that COAF sold his car without his knowledge. This claim
contradicts Wyatt's admission, made in a sworn affidavit filed with the trial court, that he received
COAF's September 16 and October 28, 2002 letters and chose not to act on them.
8. Presumably COAF allowed the case to languish because it had gotten what it
wanted--namely, possession of Wyatt's car. Wyatt's Verified Original Answer and Counter-Claim
in this suit suggests that Wyatt, who has appeared pro se in all related proceedings, believed he could
not pursue his counterclaims without additional activity by COAF. 
9. COAF filed this suit in Williamson County because Wyatt had moved there some time
between 2003 and 2005.
10. Wyatt asserts that this copy of the contract was not admissible as evidence because it was
"an oversize copy which cuts off the top of the page, thus failing to be an exact 'duplicate'" of the
original as required by Texas Rule of Evidence 1003. We disagree. Texas Rule of Evidence 1001(d)
defines "duplicate" as "a counterpart produced by [means] . . . which accurately reproduce the
original." Even though COAF's copy of the contract was partially cut off, most of the contract,
including unique identifying features such as Wyatt's signature and the Vehicle Identification
Number of his car, are readily discernible. In other words, COAF's copy accurately reproduces
enough of the original contract that one cannot reasonably doubt it is a true copy of the original.

11. This fact does not make a superfluity out of the contract provision requiring Wyatt's
consent to "any change in this contract"; that provision still applies to terms of the contract itself,
such as purchase price, interest rate, and payment dates. Nor does this fact make a superfluity out
of the contract provision stating that "[i]f no other Assignee is named in a separate assignment
attached to this contract, the Seller assigns it to Mazda American Credit." This provision does not
require a separate assignment to be attached to the contract at the time of sale. WAI did in fact
attach its Contract Assignment form to the contract when it later transmitted both documents
to Wyatt.
12. Recall that the sentence "This assignment is attached to and expressly made a part of
Contract Number ___________" was left blank. 
13. We note, however, that even though the other paperwork is not in the record, Wyatt states
in his reply brief that it included a copy of the first page of his purchase contract and a copy of his
car's certificate of title.
14. Wyatt admits that he possessed a copy of the certificate of title when he received COAF's
November 27, 2001 letter. He nevertheless argues that the certificate of title was not proof of a valid
assignment because "[s]uch a certificate is not issued as legal proof of lienholder status . . . . [It] only
stands as hearsay evidence as to any possible rights of the therein named lienholder(s)." That is not
the law. See Murrah v. Lopez, 279 S.W.2d 159, 160 (Tex. Civ. App.--Austin 1955, no writ)
(automobile titles are public records not subject to hearsay rule). In fact, notation on the certificate
of title is the only way for a lienholder to secure an automobile lien. See Tex. Transp. Code Ann.
§ 501.111(a) (West 2007).